UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEANDRO LEONEL GONZALEZ, CDCR #V-74928,<br><br>                                        Plaintiff,<br><br>vs.<br><br>CORRECTIONAL OFFICER M. DeGUZMAN, et al.,<br><br>                                        Defendants. | Case No.:  3:17-cv-00241-GPC-BGS<br><br>**ORDER GRANTING DEFENDANT DEGUZMAN'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO Fed. R. Civ. P. 56**<br><br>**[ECF No. 67]** |

Currently before the Court is a Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 by Defendant M. DeGuzman (ECF No. 67). After he was notified of the requirements for opposing summary judgment pursuant to *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998) (ECF No. 67-4), and granted an extension of time (ECF No. 70), Plaintiff filed his Opposition ("Opp'n") (ECF No. 71). DeGuzman filed no Reply.

On June 10, 2019, the Court found the matter suitable for disposition on the moving papers and ordered the matter submitted without oral argument pursuant to S.D. Cal. CivLR 7.1.d.1 (ECF No. 72). On June 18, 2019, the Court vacated its pretrial briefing schedule pending resolution of Defendant's Motion (ECF No. 74).

///

For the reasons explained, the Court **GRANTS** Defendant's Motion for Summary (ECF No. 67), **DIRECTS** the Clerk of the Court to enter judgment in favor of DeGuzman, and terminates the case.

## I.       Procedural Background

On February 8, 2017, Plaintiff filed a Complaint under 42 U.S.C. § 1983 alleging that Correctional Officers DeGuzman[1] and Rodrin violated his Eighth Amendment rights while he was incarcerated at the Richard J. Donovan Correctional Facility ("RJD") on April 6, 2015, by closing a cell door on his hand and failing to provide him medical care afterward. (*See* ECF No. 1 at 8-13, 23-24.) On April 18, 2017, the Court granted Plaintiff leave to proceed in forma pauperis, screened his Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A, and directed U.S. Marshal service on his behalf. (*See* ECF No. 4.)

On August 16, 2017, Plaintiff filed a First Amended Complaint ("FAC"). (*See* ECF No. 18.) On November 14, 2017, the Court granted Defendant Rodrin's Motion to Dismiss Plaintiff's FAC, denied DeGuzman's Motion for Joinder as moot, and granted Plaintiff leave to amend (ECF No. 33). On December 8, 2017, Plaintiff filed a Second Amended Complaint ("SAC"), re-naming Defendants Rodrin and DeGuzman, and adding O. Calderon as a Defendant. (*See* ECF No. 34.) On December 21, 2017, Rodrin and DeGuzman filed a Motion to Dismiss Plaintiff's SAC, *see* ECF No. 36, and after being served, Calderon quickly followed suit. (*See* ECF No. 44.)

On April 12, 2018, the Court dismissed all Eighth Amendment claims alleged in Plaintiff's SAC as to Rodrin and Calderon, and any conspiracy claims alleged as to all Defendants pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 49). Only the Eighth Amendment claims alleged as "Count 1" in Plaintiff's SAC against DeGuzman remain. (*See id.* at 16; SAC at 17-18.)

---

[1] Plaintiff initially misspelled Defendant DeGuzman's name as Gusman, but later corrected it. (*See* ECF No. 1 at 1, 2.)

On April 26, 2018, DeGuzman filed an Answer to Plaintiff's SAC (ECF No. 50). The parties later submitted a joint discovery plan (ECF No. 60), and on May 9, 2019, after being granted an *ex parte* extension of time, DeGuzman filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. (*See* ECF No. 67.)

## II.    Plaintiff's Claims & Evidence

In both his SAC,[2] and in his sworn declaration in Opposition to Defendant's Motion, Plaintiff claims to have reported Correctional Officer Orosco[3] to the Office of the Inspector General[4] in March 2015, alleging that Orosco had "tried to batter[] and kill [him] with the help of other C/Os" while he was housed in RJD's Building #15. (*See* SAC at 5 ¶ 10; Pl.'s Decl. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 71 [hereafter "Pl.'s Decl."] at 4 ¶ 4.) After that, Plaintiff moved to "the most far building" in RJD's

---

[2]  Unlike Plaintiff's Declaration, *see* Opp'n at 3-8, Plaintiff's SAC is *not* verified under penalty of perjury pursuant to 28 U.S.C. § 1746, although both recount the same factual allegations practically verbatim. Verified complaints may be used as opposing affidavits under Rule 56, so long as the allegations contained therein are based on personal knowledge and set forth specific facts admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4); *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members ... made statements from which a jury could reasonably infer a retaliatory motive."). Therefore, the Court will consider the unsworn allegations in Plaintiff's SAC only insofar as they provide additional background for, are consistent with his verified declaration, and to the extent they proffer testimony that could be admitted at trial. *See e.g., Tidwell v. Gallagher*, No. CV 14-5072-AG(E), 2017 WL 2801095, at *4 (C.D. Cal. Apr. 24, 2017), *report and recommendation adopted*, No. CV 14-5072-AG(E), 2017 WL 2800859 (C.D. Cal. June 27, 2017), *aff'd*, 723 F. App'x 520 (9th Cir. 2018).

[3]  Correctional Officer Orosco is not, and never has been named as a party to this case.

[4]  The California Office of Inspector General "safeguard[s] the integrity of the State's correctional system by providing oversight and transparency through monitoring, reporting, and recommending improvements to the California Department of Corrections and Rehabilitation." *See* https://www.oig.ca.gov/about-us/ (last visited Aug. 8, 2019).

"C" Facility, Building #11, and was assigned to cell #201, which he shared with Juan Rocha. (*See* SAC ¶¶ 11, 13; Pl.'s Decl. ¶¶ 4-6.)

"Since the first day in cell #201" Plaintiff claims to have "observed that the door … did not work good," and that "when the officer in the control booth tried to open the door, [it] opened about 5 or 6 inches and shackled." Plaintiff claims to have "informed the floor officers of … Building 11 regard[ing] the problem," and "request[ed] they send staff to repair[] [it]." (*See* Pl.'s Decl. ¶ 7; SAC at ¶ 14.) But "every time" he and Rocha went out of the cell, Plaintiff "had to insert[] [his] right hand in the little space of 5 or 6 inches," in order to "pull the door … open." (Pl.'s Decl. ¶ 8; SAC ¶ 15.)

On April 6, 2015, at approximately 7:20 a.m., and after having lived in cell # 201 for approximately one week, Plaintiff claims DeGuzman, who was "working that day in the control [booth] … of Building #11," opened the door "about 5 or 6 inches." (SAC ¶ 17; Pl.'s Decl. ¶ 11.) Plaintiff claims he "heard the shackle when the door stopped, … saw the little space opened, [and] … inserted [his] right hand [in the space] with the purpose to pull the door open as [he] did in past days." (Pl.'s Decl. ¶ 11; SAC ¶ 20.) Plaintiff denies having any appointment that day, claims he "did not request five to ten minutes to get ready … because no appointment [e]xisted," and that there was "no reason" for DeGuzman to open his door at 7:20 a.m." (Pl.'s Decl. ¶¶ 10, 18.) However, Plaintiff alleges he and Rocha "were ready to go to the dining room to eat the breakfast" when the door started to open. (*Id.* ¶¶ 9, 11; SAC ¶ 28; *see also* Opp'n at 38 [hereafter "Rocha Decl."].)

"When Defendant DeGuzman saw [his] right hand trying to pull the door, he closed the door clinching [Plaintiff's] right hand." (Pl.'s Decl. ¶ 12; SAC ¶ 21.) Plaintiff claims DeGuzman "saw [his] right hand trying to pull the door, because [Plaintiff] seen [sic] in direction to him when [Plaintiff] inserted [his] right hand in the little space to make sure he was ready to keeping open the door with [Plaintiff's] help." (Pl.'s Decl. ¶ 12.) Plaintiff claims the "blunt force impact in [his] right hand with the iron door was strong," the "pain in [his] right hand and arm was unbearable (a[n] agonizing pain),'" and

he "vociferated 'Open the Door[!]' to Defendant DeGuzman a couple times until he opened the door again." (Pl.'s Decl., ¶¶ 13, 18; SAC at ¶ 22; Rocha Decl. at 39.)

In his SAC, Plaintiff alleges DeGuzman "knew about the problem with [his] door" and "actually knew about the substantial risk of serious harm from the very fact that if he close[d] the door when Plaintiff inserted his right hand to pull the door to open, the risk to cause serious injuries was obvious." (SAC ¶¶ 17, 18.) Plaintiff also claims that "[a]fter [his] right hand was harm[ed]," DeGuzman "revealed … his malicious and sadistic plan," because he "made a sign corroborating his intentional 'setting up' enjoying his act," *see* Pl.'s Decl. ¶ 15, and "enjoying his crime[]." (SAC ¶ 25.)

After the door opened and Plaintiff was able to remove his right hand, he "saw [his] fingers with deep cuts bleeding," and "waited a couple minutes expecting … DeGuzman [to] provide him with emergency care services," to "call[] the nurse to the building," or to let him go to the clinic. (SAC ¶ 33.) "After some minutes," Plaintiff "understood that DeGuzman d[id] not want[] to help," (*id.*), so he called a porter, "showed [his] injuries" through the cell window, and asked the porter to "explain to C/O Rodrin that [he] had a medical emergency." (Pl.'s Decl. ¶¶ 14, 17; SAC ¶ 33-34.) Plaintiff claims he saw the porter speak to Rodrin, but Rodrin also "did nothing to get care for [him]." (Pl.'s Decl. ¶ 16; SAC ¶ 34.)[5]

After about an hour, Plaintiff claims that instead of releasing the inmates in Building 11 to "walk[] to the dining hall" for breakfast that day, kitchen staff delivered breakfast trays to the building. DeGuzman then opened all the building's cell doors so all inmates could pick up their trays. (Pl.'s Decl. ¶ 18; SAC ¶ 35.)

Plaintiff came out from his cell, picked up his tray with his left hand, and stopped to show Rodrin his "open wounds" and "still bleeding … fingers." (Pl.'s Decl. ¶ 19; SAC ¶ 36.) He requested "immediate health care services," but Rochin "ordered [him] back to

_____

[5] Plaintiff's Eighth Amendment claims related to Rodrin's alleged indifference to his injuries were dismissed on April 12, 2018. *See* ECF No. 49.

[his] cell." (Pl.'s Decl. ¶ 19; SAC ¶ 36.) Plaintiff remained in his cell "suffering … a prolonged, manifest and agonizing pain," *see* SAC ¶ 37, until "suddenly" at "approximately 9:00 a.m.," "[t]he door opened again." (*id.*; Pl.'s Decl. ¶ 20.) Plaintiff again approached Rodrin and requested immediate help, but Rodrin "refused to assist[]." Plaintiff then asked for the name of the control booth officer, and Rodrin replied, "DeGuzman." (Pl.'s Decl. ¶ 20; SAC ¶ 37.)

Later that afternoon, Plaintiff submitted two "HCSRF (medical request)" forms, describing his "health problem[s]" as a result of the "battery." (Pl.' Decl. ¶ 21, SAC at 42, 43.) In one, Plaintiff reported to suffer "shame, humiliation, and mental distress because [at] about 7:00 am Officer [DeGuzman] working in the control clinch[ed] [his] right hand intentional[ly] cutting part of [his] fingers" and "after that … insinuate[d] that he put [Plaintiff] [in] a trap." (*See* SAC at 42.) In another, Plaintiff reported his "nerves received damage[] and [his] arm's bones [were] in pain." (*Id.* at 43.) Both these requests were classified as "routine," and on the next day, April 7, 2015,[6] Plaintiff was summoned to the clinic, interviewed, and examined by a nurse, Defendant O. Calderon. (Pl.'s Decl. ¶¶ 24-25; SAC at 43.)[7] Calderon's encounter notes indicate Plaintiff was ambulatory, and he presented with swelling, bruising, and discoloration on his right hand, but was "able to make a fist." (SAC at 43, 62; Pl.'s Decl. ¶ 26.) Calderon also noted several "small" ½ cm lacerations on his 2d, 3rd & 4th digits, recommended Plaintiff follow up with his primary care physician "as scheduled," advised him to continue on a previously prescribed dose of Naproxen, and told him: "It will heal." (Pl.'s Decl. ¶ 26; SAC ¶ 62.) Calderon's April

_____

[6] Plaintiff's HCSRFs are dated April 7, 2015, but in his Declaration, he claims he was not examined by Calderon until April 8, 2015, and that she "made a fabrication" and "perpetrat[ed] [a] lie" as to "some … parts of [her] medical report." *See* Pl.'s Decl. ¶¶ 27-31; SAC ¶ 51.

[7] Plaintiff's Eighth Amendment claims against Defendant Calderon, like those alleged against Defendant Rodrin, were dismissed together with Plaintiff's conspiracy claims as to all Defendants, on April 12, 2018. *See* ECF No. 49.

7, 2015 encounter form further notes Plaintiff "state[d] [the] cell door got closed on his hand," and "then stated the cell door was stuck and he pulled it and it closed on his hand." (SAC at 43.)

During the second week of April, another inmate, Efren Silva, claims he saw Plaintiff "walk[ing] around the yard," and asked him to do pull-ups. (*See* Opp'n at 49 [hereafter "Silva Decl."].) Plaintiff told Silva "no because he had serious injuries on the fingers of his right hand," and Plaintiff reported to Silva he could "not use his right hand and arm." (*Id.*) Silva attests he saw "deep cuts" on Plaintiff's fingers at the time. (*Id.*) "At the beginning of May," Silva "talked with [Plaintiff] again," and when Plaintiff "showed … [him] his right hand, the cuts on his fingers were healing." (SAC at 49.)

On September 27, 2015, Plaintiff submitted another HCSRF form complaining that even after "5 months and 3 weeks," "the bones of [his] hand were still in pain." (Pl.'s Decl. ¶ 31; SAC at 45.) He was evaluated the following day, his musculoskeletal complaint was classified as "routine," and he was again referred to his primary care physician "as scheduled." (SAC at 45.)

Almost two years later, on July 25, 2017, Plaintiff submitted an additional HCSRF claiming he "still had problems with the mobility in [his] fingers," and requesting that Rodrin "stop the pattern of wanton misconduct" in "den[ying] … [him] health care services." (Pl.'s Decl. ¶ 32; SAC at 80.) On October 19, 2017, he was evaluated by Dr. Richard N. Gray, via a telemedicine conference held at Mule Creek State Prison. (SAC at 81; Pl.'s Decl. ¶ 34.) Gray noted Plaintiff reported suffering from "headaches, cLBP, testicular disfunction, myopia, and a seizure disorder," but an interim hospitalization and antibiotics had resolved his testicular infection. (SAC at 81.) Plaintiff also complained of 10 years of progressive back pain, to have suffered a seizure in 2016, and reported having his right hand "slammed in a door" two years earlier in 2015. (*Id.*) Gray's Medical Progress Notes indicate Plaintiff reported his hand pain had resolved, but that he "did not have control" or "use of that hand that he has previously." (*Id.*) Gray noted Plaintiff's right hand grip as "decreased at IV/V." (*Id.*)

## III.    Defendant's Claims & Evidence

Correctional Officer M. DeGuzman was working overtime as the second watch control booth officer assigned to RJD's Facility "C" Housing Unit #11 on April 6, 2015. (*See* Def.'s P&As, Declaration of M. DeGuzman in Supp. of Mot. for Summ. J., ECF No. 67-8 [hereafter "DeGuzman Decl."], ¶ 2.) Second watch lasts from 6:00 a.m. to 2:00 p.m. (*Id.*) As the control booth officer, DeGuzman was responsible for "the coverage of correctional officers and the supervision of inmates" assigned to the Unit. (*Id.* ¶ 3.) His responsibilities also include: the "overall health, welfare and custody of all inmates in the building; the accountability and maintenance of all equipment under [his] control; the alert supervision of inmate activities within [his] scope of vision; the prevention of escape or escape attempts; … the control of inmate movement[,] … [and] the inventory and inspection of all weapons and ammunition." (*Id.*) Guzman is not "allowed to leave the control tower during [his] shift." (*Id.*)

On the morning of April 6, 2015, DeGuzman claims Unit #11 "floor officers" received a phone call at the podium of the Unit informing them that Plaintiff "had an appointment outside of the housing unit that he had to attend." (*Id.* ¶ 4.) Rodrin attests he was working as "Floor Officer #2" at the time.  (*See* Def.'s P&As, Declaration of L. Rodrin in Supp. of Mot. for Summ. J., ECF No. 67-10 [hereafter "Rodrin Decl."], ¶ 2.) As a Floor Officer, Rodrin was "responsible for arranging for inmates to leave the housing unit" for appointments such as "medical and dental appointments." (*Id.* ¶ 3.)

"One of the floor officer[s] shouted up to DeGuzman in the control booth to open cell 201 so [Plaintiff] could leave the cell and attend the appointment." (DeGuzman Decl. ¶ 4.) DeGuzman "began opening the cell door, but then the floor officer shouted up to [him] that [Plaintiff] requested five to ten minutes to get ready for the appointment." (*Id.*) DeGuzman attests this is a "common" occurrence. (*Id.*)

DeGuzman does not, however, recall hearing anyone yelling that Plaintiff's hand was caught between the closed door and the door frame on April 6, 2015, and "did not witness [Plaintiff's] hand get caught." (*Id.* ¶ 5.) Rodrin also does not recall hearing

8

anyone yell that Plaintiff's hand was caught in his cell door, did not see Plaintiff's hand caught in the door, and testifies that Plaintiff neither informed him of the incident afterward, nor asked him for medical attention. (*Id.*) In short, Rodrin claims he does not recall "any such event occurring in the housing unit on April 6, 2015, or at any other time," and posits that he "would have remembered if [it] had because that would have been a very unusual occurrence." (*Id.* ¶ 4.)

Both DeGuzman and Rodrin further contend it is practically "impossible" for an inmate to "have his hand caught between the cell door and the doorframe" as Plaintiff claims, because the cell doors move slowly when closing and opening, "it takes approximately four seconds for the door to fully open or close," and "there is the sound of metal engaging the closing mechanism" which provides a warning that the door is about to close and puts the inmates "on notice." (DeGuzman Decl. ¶ 6; Rodrin Decl. ¶ 6.) "[E]ven if it was open only five to six inches when the inmate put his hand on the door," as Plaintiff claims happened on April 6, 2015, both DeGuzman and Rodrin claim it would be "nearly impossible" for him to be unable to remove it when the door began to close. (*Id.*)

DeGuzman further attests it is "practically impossible" for him to have seen Plaintiff's hand in between the cell door and frame on April 6, 2015, because he was assigned to cell 201, which is the furthest cell from the control booth and difficult to see from the control panel, which is situated in the center of the U-shaped housing unit. (DeGuzman Decl. ¶¶ 5, 7.) As he faces the control panel, cell 201 is "in the far corner and over [his] left shoulder. (*Id.*; *see also* Ex. A, ECF No. 67-9 at 3.) DeGuzman contends he must face the control panel, press the button correlating with a cell number, and hold it down in order to open or close the automated cell door. (DeGuzman Decl. ¶ 6.) The door stops moving if he takes his finger off the button, and therefore DeGuzman claims there "is no way [he] could have known if [Plaintiff's] hand was in danger of being caught" on April 6, 2015, because it is "nearly impossible for [him] to view cell 201 over [his] left shoulder" while he was also pressing the cell door's button. (*Id.* ¶ 7.)

Neither DeGuzman nor Rodrin "had [or] have [any] knowledge that there was a problem" with cell 201's door and both testify they were unaware of any "malfunction." (*Id.* ¶ 8; Rodrin Decl. ¶ 7.) DeGuzman further claims to have re-opened door 201 approximately five to ten minutes after Plaintiff claims to have been injured "without any incident or … report that [Plaintiff] was injured." (DeGuzman Decl. ¶ 7.) DeGuzman swears he "did not intentionally close the cell door on [Plaintiff']s hand," "never had any animosity toward [Plaintiff] and did not make any sign to him that [he] intentionally 'set [Plaintiff] up.'" (*Id.* ¶ 9.) Instead, DeGuzman claims he "simply opened the cell door as requested by the floor officer." (*Id.*)

Former Defendant O. Calderon was the registered nurse at RJD and was on duty on April 7, 2015. (*See* Decl. of O. Calderon in Supp. of Def.'s Mot. for Summ. J., ECF No. 67-5 (hereafter "Calderon Decl."), ¶ 2.) At 8:00 a.m. on April 7, 2015, Calderon examined Plaintiff's right hand and documented her findings on the CDCR HCSRF 7362 Plaintiff submitted the day before. (*Id.* ¶¶ 2-3, *see also* Ex. A, ECF No. 67-6 at 3.) Calderon's encounter notes indicate Plaintiff presented with a "small laceration to his second, third, and fourth digits that were only a half a centimeter long." (*Id.* ¶ 3.) However, Plaintiff was able to make a fist, his "vital signs, [] circulation, sensation, and movement were within normal limits," and she "saw no swelling, no bruising, no discoloration, […] no gross deformity. …[and] no bleeding or sign of infection." (*Id.*) Calderon advised Plaintiff to continue taking the naproxen he had already been prescribed to treat an unrelated condition if necessary, and found his injuries did not require referral to a primary care physician, but directed Plaintiff to seek medical attention if his condition worsened. (*Id.* ¶ 4.)

Calderon's review of Plaintiff's medical records also confirm that he reported continued pain in the second, third, and fourth fingers on his right hand on July 26, 2017, and while he was incarcerated at Mule Creek State Prison. (*Id.* ¶ 5.) The nurse who examined Plaintiff at MCSP also recorded "no abnormalities," and found Plaintiff was able to "close and open R hand, able to move all digits freely w/o any difficulties." (*Id.*

¶ 5; Ex. B, ECF No. 67-6 at 5-7.) Plaintiff was prescribed ibuprofen, and instructed to follow up in the RN clinic in 72 hours if his symptoms persisted. (*Id.*)

**IV.   Defendant's Motion for Summary Judgment**

   A.   <u>Standard of Review</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

As the moving party, Defendant DeGuzman "initially bears the burden of proving the absence of a genuine issue of material fact." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). He may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

While Plaintiff bears the burden of proof at trial, DeGuzman "need only prove that there is an absence of evidence to support [Plaintiff's] case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." *Id.* at 323.

If DeGuzman as the moving party meets his initial responsibility, the burden then shifts to Plaintiff to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the allegations or denials of his pleadings, but is instead required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, to support his contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

Plaintiff must also demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of his suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for him. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

Finally, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, if Plaintiff "fails to properly support an assertion of fact or fails to properly address [Defendant's] assertion of fact, as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ...." Fed. R. Civ. P. 56(e)(2). Nor may the Court permit Plaintiff, as the opposing party, to rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). A "motion for summary judgment may not be defeated ... by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477

U.S. at 249-50 (1986); *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("'[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.'") (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996)) (brackets in original)).

B.    Defendant's Arguments

DeGuzman seeks summary judgment as to Plaintiff's Eighth Amendment claims arguing: (1) no evidence in the record shows he intentionally closed the cell door on Plaintiff's hand with any malicious or sadistic intent; (2) no evidence further shows he acted with deliberate indifference to Plaintiff's injuries; and (3) he is entitled to qualified immunity. (*See* Def.'s Mem. of P&As in Supp. of Mot. for Summ. J., ["P&As"], ECF No. 67-1 at 14-21.)

C.    Plaintiff's Opposition

Plaintiff contends DeGuzman is not entitled to summary judgment because "his factual allegations are not correct," and there exist material factual disputes as to his Eighth Amendment claims. (*See* Opp'n, ECF No. 71 at 3, 12-19.) Specifically, Plaintiff argues the testimony proffered in both his sworn Declaration, (*id.* at 3-8), together with the sworn declaration of his cellmate, Juan Rocha, (*id.* at 38-39), are "squarely contradictory [with DeGuzman's] as to whether or not [he] suffered a battery," and they provide the "proof or evidence that … DeGuzman intentionally closed the cell door on his hand sadistically and maliciously for the sole purpose of harming [him]." (*Id.* at 16.) Plaintiff further contends the medical records attached to his Opposition[8] are sufficient to

_____

[8] Although unauthenticated, Plaintiff's medical records could be rendered admissible at trial and DeGuzman does not challenge their authenticity. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); *see also Aholelei v. Hawaii Dept. of Public Safety*, 220 Fed. Appx. 670 (9th Cir. 2007); *Foster v. Statti*, 2013 WL 5348098, at *12 (E.D. Cal. Sept. 23, 2013), *adopted*, 2014 WL 931830 (E.D. Cal. Mar. 7, 2014) (considering

13

show he suffers from "significant and permanent injuries in his right hand from the blunt force impact between the cell door and the door frame," (*id.* at 19), and the "fact that force was used unnecessar[ily] against [him] … is in itself evidence that … DeGuzman was acting 'maliciously and sadistically.'" (*Id.*)

D.  Cruel and Unusual Punishment

As an initial matter, the Court notes that the Eighth Amendment violations alleged against DeGuzman in Count 1 of Plaintiff's SAC are twofold. First, he claims DeGuzman committed an act of "battery" against him by closing his cell door with malicious and sadistic intent to do harm. (*See* SAC at 17 ¶¶ 79, 84.) Second, Plaintiff contends DeGuzman acted with "deliberate indifference" by "creat[ing] an unreasonable risk of serious harm" and "fail[ing] to respond reasonably" to the danger posed by his malfunctioning cell door. (*Id.* ¶¶ 80, 83, 85.)

In general, an Eighth Amendment violation occurs only when an inmate is subjected to the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Jeffers v. Gomez*, 267 F.3d 895, 900 (9th Cir. 2001). Negligence is insufficient to constitute cruel and unusual punishment because "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319. Accidents alone are not constitutional violations. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain.");

Thus, with respect to Plaintiff's first claim that DeGuzman "battered" him with the cell door, the "core judicial inquiry" is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of

unauthenticated prison medical records on summary judgment because the documents could be made admissible at trial).

causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (extending *Whitley*'s Eighth Amendment analysis from prison riots to "whenever guards use force to keep order."); *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010). In making this determination, courts consider factors such as: (1) extent of the injury, (2) need to use the force, (3) relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force. *Hudson*, 503 U.S. at 7 (citations omitted).

Ultimately, however, Plaintiff must show more than "merely objectively unreasonable force," *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002), in order to prove that DeGuzman acted in bad faith with the intent to harm him. *Wilkins*, 559 U.S. at 37; *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 795 (9th Cir. 2018); *Hoard v. Hartman*, 904 F.3d 780, 790 (9th Cir. 2018). "[T]he phrase 'maliciously and sadistically' serves a predominantly rhetorical function. Rather than create additional elements for [the] plaintiff[] to satisfy, the use of these two terms emphasizes the cruelty inherent in harming an inmate for no other reason than to cause harm." *Hoard*, 904 F.3d at 789 (citing *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 175 n.1 (3d Cir. 2001) (explaining that "[t]he use of the term 'sadistic' in this standard is something of a misnomer," because "[p]recedent does not require that the alleged offender take pleasure or satisfaction from the injury, as the term entails, but rather only that the offender intended harm."); *see also Jeffers v. Gomez*, 267 F.3d 895, 912 (9th Cir. 2001) (affirming summary judgment on behalf of correctional officers because there was an "absence of evidence showing that either officer acted purposely to injure" and the officers' actions did not suggest "malice or sadism or otherwise create an inference of impermissible motive.").

With respect to Plaintiff's claim that DeGuzman failed to "respond reasonably" and acted with "deliberate indifference" to his "Eighth Amendment [r]ights," *see* SAC at 17 ¶¶ 80, 85, he must prove that DeGuzman was not only "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exist[ed],'" but also

that DeGuzman "also dr[e]w the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

Thus, DeGuzman may be held liable under the Eighth Amendment only if evidence suggests he closed cell door 201 with conscious disregard of a "substantial risk" that Plaintiff would suffer serious injury as a result. *Farmer*, 511 U.S. at 834 (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). If, on the other hand, the evidence merely suggests DeGuzman "should have been aware of the risk, but was not, then [he] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1187-88 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Plaintiff must point to evidence sufficient to show a genuine dispute as to whether DeGuzman was "subjectively aware of the risk" posed by his cell door; "it is not enough that [DeGuzman] objectively should have recognized the danger but failed to do so." *Jeffers*, 267 F.3d at 914 (citing *Farmer*, 511 U.S. at 838).

In short, deliberate indifference, like the malicious and sadistic intent required to support an excessive force claim, is a "high legal standard," above that required to establish liability for negligence. *Toguchi*, 391 F.3d at 1060; *Farmer*, 511 U.S. at 835 (deliberate indifference requires evidence of "a state of mind more blameworthy than negligence" and "'more than ordinary lack of due care for the prisoner's interests or safety.'" (quoting *Whitley*, 475 U.S. at 319).

E.    Discussion

Based on the evidence in the record before it, and in light of the relevant law, the Court finds, for the reasons set forth below, that no genuine dispute exists as to whether DeGuzman closed Plaintiff's cell door on April 6, 2015 with the malicious and sadistic intent necessary to support an Eighth Amendment violation. *Hudson*, 503 U.S. at 6. The Court further finds no genuine dispute as to whether DeGuzman acted with deliberate indifference to a serious risk to Plaintiff's health or safety when he closed Plaintiff's cell

door.[9] *Farmer*, 511 U.S. at 834. Therefore, Defendant DeGuzman is entitled to summary judgment pursuant to Fed. R. Civ. P. 56(a).

DeGuzman attests he opened cell door 201 on April 6, 2015, at the request of one the floor officers, so Plaintiff could leave to attend an appointment, and then closed it after he was informed the inmate in cell 201 needed more time to get ready.[10] (DeGuzman Decl. ¶ 4.) Both DeGuzman, the officer charged with the responsibility to control all inmate movement in Housing Unit #11, and Rodrin, the floor officer who authorized the release of individual inmates educated to attend appointments elsewhere,

---

[9]  The Court notes that a portion of DeGuzman's Motion assumes Plaintiff's Eighth Amendment "deliberate indifference" claims are premised on an alleged failure to provide adequate medical care for his injuries. (*See* Def.'s P&As at 17-19.) While it is true Plaintiff alleges to have "waited a couple minutes expecting … DeGuzman [to] provide[] him with emergency medical care services," *see* SAC at 8 ¶ 33, the gravamen of his Eighth Amendment claims as alleged against DeGuzman in "Count 1" focus primarily on DeGuzman's "battery," and his "use [of] the [cell] door as a deadly weapon." (SAC ¶ 27.) While he contends DeGuzman acted with both malicious and sadistic intent and with deliberate indifference when he closed cell door 201 on April 5, 2015, *see id.* ¶¶ 78-90, Plaintiff's Eighth Amendment inadequate medical care claims are alleged solely against Correctional Officer Rodrin and RN Calderon. (*See id.*, "Second Cause of Action" ¶¶ 91-101.) All claims as to both those parties have already been dismissed. (*See* ECF 49 at 15-16.)

[10] Plaintiff contends he had no appointment on that day, and did not request five to ten minutes to get ready "because no appointment [e]xisted." (*See* Pl.'s Decl. ¶ 10.) Instead, both he and Rocha claim that when the cell door opened 5 or 6 inches at approximately 7:20 a.m., they "were ready to go the dining room to eat … breakfast." (*Id.* ¶ 11; Rocha Decl., ECF No. 71 at 38.) While it is true the parties offer differing justifications as to why DeGuzman *opened* cell door 201 that morning, this factual dispute is not material as to whether DeGuzman violated the Eighth Amendment when he *closed* the door and caused Plaintiff's injury. *See Anderson,* 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989); *Disney Enterprises, Inc. v. VidAngel, Inc.,* 371 F. Supp. 3d 708, 714 (C.D. Cal. 2019).

deny having any knowledge of a cell door malfunction either before *or* after April 6, 2015. (*See* DeGuzman Decl. ¶ 8; Rodrin Decl. ¶ 7.) Even if Plaintiff "informed … the officers of the building about the problem with his door," he does not identify either DeGuzman or Rodrin as one of those officers. (*See* Pl.'s Decl. ¶ 14). And while Plaintiff's cellmate J. Rocha corroborates his claims that the "door d[id] not work good," and that "everytime [they] ha[d] to get out of [their] cell, … [they] ha[d] to pull it open," (Rocha Decl., ECF No. 71 at 38-39), Rocha offers no independent or corroborating testimony to substantiate Plaintiff's claims that DeGuzman knew the door was broken, actually witnessed Plaintiff "trying to pull the door," or saw or was in a position from which he could see Plaintiff's hand was in danger of being "clinched" by the door when he closed it from his post in Housing Unit #11's control booth. (*Cf.* Pl.'s Decl. ¶ 12.)

Both DeGuzman and Rodrin further attest that the mechanical cell doors in Housing Unit #11 "move[] slowly when opening and closing," that "[i]t takes approximately four seconds for the door to fully open or close," and that "there is a sound of metal engaging the closing mechanism warning the inmate that the door is about to close." (DeGuzman Decl. ¶ 6; Rodrin Decl. ¶ 6.) Both also swear that "even if [the cell door] was open only five to six inches when the inmate put his hand on the door," as Plaintiff claims happened here (*see* Pl.'s Decl. ¶ 11), "it would be nearly impossible for [him] to be unable to remove his hand … if it began to close." (DeGuzman Decl. ¶ 6; Rodrin Decl. ¶ 6.) These sworn allegations are uncontroverted; in fact, Plaintiff himself offers testimony that arguably corroborates Defendant's description as to the warning noise the cell door makes when the closing mechanism engages. He admits under penalty of perjury that he "heard the door shackle" before he inserted his hand in the cell door opening, and he offers no contrary testimony and points to no evidence in the record which shows why or whether he was unable to remove his hand in the time both DeGuzman and Rodrin attest it takes for the cell door to fully shut. (*See* Pl.'s Decl. ¶ 11.) Although "[t]he evidence of [non-movant] is to be believed, and all justifiable inferences are to be drawn in his favor," Plaintiff "must do more than simply show that there is some

18

metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.*, 475 U.S. at 587. He cannot avoid summary judgment by relying solely on conclusory allegations unsupported by admissible facts in the record. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *see also Romero v. Nevada Dep't of Corr.*, No. 2:08-CV-808-JAD-VCF, 2013 WL 6206705, at \*10 (D. Nev. Nov. 27, 2013) (summary judgment warranted where pro se prisoner failed to offer admissible evidence to contradict prison official's verified interrogatory responses as to a material dispute).

Plaintiff also points to no evidence to contradict DeGuzman's testimony that as the Control Booth Officer, it was "nearly impossible for [him] to fully view cell 201 over [his] left shoulder" while he was simultaneously facing the control panel in the center of the Housing Unit, and pressing and holding the cell door button down. (DeGuzman Decl. ¶ 6.) In his Opposition Plaintiff argues that DeGuzman "did not need[] to face the control panel when opening a cell door," and that DeGuzman's claims are "contrary to the standard used by the rest of the officer[s] working in the control[] booth[s]." (*See* ECF No. 71 at 15.) But these allegations are not included in his sworn Declaration, and Plaintiff points to no other admissible evidence in the record to contradict DeGuzman's sworn testimony as to either the mechanics of the control booth's door operation or the physical floor plan of Housing Unit #11, which offers further corroboration of DeGuzman's description of cell 201's location and his line of vision. (*See* ECF No. 67-9.) "[L]egal memoranda and oral argument are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978); *see also Perez v. VITAS Healthcare Corp. of California*, No. CV161681DSFAJWX, 2017 WL 5973294, at \*1 (C.D. Cal. Mar. 29, 2017), *aff'd sub nom. Perez v. Vitas Healthcare Corp.*, 739 F. App'x 405 (9th Cir. 2018).

Finally, Plaintiff attests he looked in DeGuzman's direction when he inserted his hand in the cell door opening in order to "make sure he was ready to keep[] the door open," and he claims DeGuzman "revealed … his malicious and sadistic plan" by

"ma[king] a sign" indicating that he enjoyed "setting [him] up." (Pl.'s Decl. ¶ 15.)
Plaintiff does not describe DeGuzman's "sign" however, and his cellmate Rocha, who
swears to have witnessed the incident, does not corroborate Plaintiff's claims that
DeGuzman made any such gesture. (*Cf.* Rocha Decl., ECF No. 71 at 38-39.) Plaintiff
speculates that DeGuzman's actions were "premeditated" and that he "wanted to hurt
[him]" as part of a "buddy system … where most all Correctional Staff … side with one
another … against prisoners who are viewed as … troublemakers, or those [who] write
grievances against staff." (FAC at 3-4 ¶ 5.) Plaintiff further suggests the letter he wrote to
the Inspector General regarding Correctional Officer Orosco in March 2015 is related to
his April 6, 2015 injury, because "weeks after, [he wrote it he] was battered [by]
defendant M. DeGuzman." (*Id.* at 4-5 ¶¶ 5, 10-11.)

But bare and unsworn assertions such as these, which are not supported by any
other admissible evidence in the record, do not preclude summary judgment. *California
Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th
Cir. 1987). Moreover, DeGuzman swears he made no such "sign" and he attests he never
had any animosity toward Plaintiff whatsoever. (DeGuzman Decl. ¶ 9.) In fact, Plaintiff
admitted during his deposition testimony that he had no prior interactions with
DeGuzman and "ha[d] no proof" of any connection between Officer Orosco in Building
15 and DeGuzman in Building 11. Plaintiff further admitted under penalty of perjury that
he "never s[aw] Officer [Oro]sco talking to Officer DeGuzman," and he "d[idn't] know if
they are friend[s]." (*See* ECF No. 67-2, Ex. A "Deposition of Leandro Leonel Gonzalez"
at 4-5.)

"Unsupported speculation as to [a] defendants' intent toward plaintiff is wholly
insufficient to support a claim at summary judgment." *Lawson v. Tehama Cty.*, No. 2:17-
CV-01276-TLN-CKD-PS, 2019 WL 636852, at *6 (E.D. Cal. Feb. 14, 2019). A
"[p]laintiff's characterization of defendant's actions, and speculation about defendant's
intent, do not constitute admissible evidence and [may] be disregarded."); *Kessler v.
Hight*, No. 2:16-CV-01930-TLN-AC-PS, 2018 WL 1806460, at *3 (E.D. Cal. Apr. 17,

2018); *Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 993 (N.D. Cal. 2017) (finding plaintiff lacked personal knowledge to competently testify about the meaning behind defendant's smile, and granting summary judgment because plaintiff offered only "simpl[e] speculation" but no other corroborating admissible facts as to defendant's intent). "[M]ere speculation for the critical facts, without a showing of foundation in personal knowledge[ ] for the facts claimed to be at issue," is an insufficient basis upon which a reasonable jury could return a verdict in Plaintiff's favor. *John M. Floyd & Assoc., Inc. v. Tapco Credit Union*, 550 Fed. App'x. 359, 360 (9th Cir. 2013); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"); *Dark v. Curry County*, 451 F.3d 1078, 1082 (9th Cir. 2006) ("[T]he nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

Therefore, based on the evidence presented, the Court finds no reasonable trier of fact could conclude that DeGuzman knew Plaintiff had placed his hand in cell 201's door opening on April 5, 2015, and intentionally closed it either with deliberate indifference to a serious risk to Plaintiff's health or safety, or with malicious and sadistic intent to cause Plaintiff harm. Accordingly, DeGuzman is entitled to summary judgment as to Plaintiff's Eighth Amendment claims.[11]

---

[11] Because the Court finds no genuine dispute as to any Eighth Amendment violation, it need not further decide whether DeGuzman is also entitled to qualified immunity. *See Greisen v. Hanken,* 925 F.3d 1097, 1108 (9th Cir. 2019) ("In resolving whether a government official is entitled to qualified immunity, a court 'must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right,' and, if so, 'whether the right at issue was "clearly established" at the time of defendant's

## V.   Conclusion and Order

In light of the above, the Court **GRANTS** Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a) [ECF No. 67] and **DIRECTS** the Clerk of the Court to enter judgment in favor of Defendant M. DeGuzman and to close the file.

**IT IS SO ORDERED**.

Dated:  September 4, 2019

Hon. Gonzalo P. Curiel
United States District Judge

---

alleged misconduct.'"'") (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted); *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). However, when "[t]aken in the light most favorable to the party asserting the injury, … the facts alleged [do not] show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201, "the question of immunity becomes moot." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 236); *see also Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012) ("If [the court] answer[s] the first of the two inquiries in the negative, then the officer's conduct was constitutional, and there can be no violation of § 1983. The officer has no need for immunity; he is innocent of the alleged infractions.").